Richard Lewis **WILLMANN**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–85–00118–CR.

Court of Appeals of Texas,
San Antonio.

Nov. 5, 1986.
Rehearing Denied Dec. 10, 1986.

Paul J. Goeke, San Antonio, for appellant.

Sam Millsap, Jr., Bruce Baxter, Michael Edwards, Charles Estee, Criminal Dist. Attys., San Antonio, for appellee.

Before BUTTS, CANTU and REEVES, JJ.

BUTTS, Justice.

This is an appeal from a murder conviction in which the jury sentenced appellant to forty years' imprisonment.

On February 2, 1984, appellant, Richard Willmann, armed with a 16 gauge Winchester shotgun, shot and killed his brother, John Willmann, in the bedroom of appellant's home. The shooting ended a longstanding dispute over the administration of their parents' estate and other financial matters.

At trial appellant claimed he acted in self-defense. He testified that following a particularly heated argument, in which appellant accused his brother of "robbing" the estate, he heard his brother unlock a desk where he knew there was a .25 cali-

ber, nickel plated, automatic pistol. He stated he feared his brother was going to kill him; he went to his room and sat on his bed with a loaded shotgun. A few minutes passed and his brother entered the room allegedly carrying the shiny pistol. Appellant fired, striking his brother in the heart.

The State, however, presented evidence from the medical examiner that the deceased's palms contained traces of antimony, barium and lead, three elements present in primers of all center fire shells, including the 16 gauge shotgun shell. Because of this, it was the medical examiner's conclusion that decedent's hands were open and facing the barrel of the shotgun during the blast.

He also stated his conclusion that the fatal shot was fired from two to three feet away since the wound was round as opposed to scalloped (which results after about four feet) and contained traces of Winchester ball powder and wadding. No debris (blood, powder, wadding, or other material) was found on the pistol.

Appellant in his first point of error alleges the trial court erred in denying a motion for new trial pursuant to TEX.CODE CRIM.PROC.ANN. art. 40.03(7) (Vernon 1979). At the hearing appellant called four jurors, none of whom had made an affidavit.[1] They recalled during deliberations another juror demonstrated loading the automatic pistol appellant claimed his brother was holding at the time of the shooting. Three of these jurors remembered the man said he was familiar with firearms and owned an automatic pistol. The jurors further recalled this man used his fingers to hold the clip. Another juror, unfamiliar with guns, also loaded the pistol by holding the clip with his fingers only. The jurors all recalled defense counsel demonstrated loading the gun. Article 40.03(7), *supra*, specifies:

New trials, in cases of felony, shall be granted the defendant for the following causes, and no other:

\* \* \* \* \* \*

---

1. *See* TEX.CRIM.EVID.R. 606(b) effective September 1, 1986.

(7) Where the jury, after having retired to deliberate upon a case, has received other evidence; ...

 In addition to being received by the jury, the "other evidence" must be detrimental to the defendant in order to warrant a new trial. *Hunt v. State*, 603 S.W.2d 865, 868 (Tex.Crim.App.1980). Conflicting evidence on the issue of whether the jury received other evidence presents a fact question for the trial court whose determination will be final unless the defendant can show that court abused its discretion. *Id.; McIlveen v. State*, 559 S.W.2d 815, 818–19 (Tex.Crim.App.1977). But if the evidence at the motion for new trial is uncontroverted and shows the jury received other, detrimental evidence during deliberations, the defendant need not show he was harmed by the evidence; he is entitled to a new trial as a matter of law. *Hunt, supra* at 869; *Rogers v. State*, 551 S.W.2d 369 (Tex.Crim.App.1977).

The State urges that the juror's demonstration did not present "other evidence" because defense counsel himself handled the pistol during argument, and that his demonstrations of the clip and gun while cross-examining the medical examiner placed the evidence before the jury.

During the defense's cross-examination of State's witness, Dr. DeMaio, the medical examiner, the following exchange occurred:

Q: ... [W]e'll call that a side view of a—an automatic, okay? [referring to a sketch]

A: Yes, sir.

Q: Now, down in this area here (indicating) is where the clip is on the weapon, isn't that true?

A: Yes, sir.

Q: Okay. Now—and I think we have the clip to that weapon here.

Defense Counsel: Your Honor, shall I have the sheriff remove the bullet from that?

The Court: Why do you need the clip?

Defense Counsel: I was going to show that it can—how it's inserted in the weapon. I didn't want to put a bullet in the weapon.

The trial court allowed the removal of the bullet, and counsel continued to question the medical examiner. He asked the medical examiner to demonstrate and explain the firing mechanism of the pistol with the clip. He asked whether the clip and the chamber would have primer residue on them after the gun was fired. The doctor agreed that primer residue would be present under those circumstances. Defense then asked whether, assuming a person took the gun, removed the clip and loaded it with bullets, that person would have residue in his hand. Further if the person took some time loading the gun, maybe "switched it back and forth, [he would] end up with [residue on] both of their (sic) hands." The doctor answered affirmatively to both questions. Defense counsel then suggested the person might rub his hands together and have residue all over both hands. Defense then asked:

Q: If a person had handled a ... clip with primer residue on it, prior to his having been shot, would that change your opinion as to whether or not that primer residue meant absolutely that his hands were out like that when he was shot?

A: It is possible to get some contamination of the hand. My personal opinion is that these levels [of residue] are too high for that to be this way.

Q: Okay. You're pretty sure that this would have to come from gunshot residue?

A: Yes, sir.

Q: But that could come from handling a gun that was contaminated with gunshot residue, as well as having their hands out when the gun was fired near you, is that true?

A: It's theoretically possible. I think it's improbable, but it's possible.

At the hearing on the motion for new trial the jurors agreed they accepted the testimony of the medical examiner and spent little time on the residue question. They did note the gun was "clean." The

State in jury argument had pointed out there was no evidence that the pistol had ever been fired, the conclusion being that no residue was in the chamber or on the clip of the pistol to get on the hands.

The fourth juror, Dempsey, stated he was familiar with guns as a result of military duty, but he did not tell this to the others. He said he saw the juror hold the clip with his fingertips, "but the size of the clip to me would be—you would have to . . . [hold it with your fingertips]."

All four of the jurors testified they recalled defense counsel during jury argument handling the gun. Defense counsel argued:

... And he [medical examiner] said that primer residue is a function of all guns shooting, not just shotguns, but all guns. And this kind of gun works in a manner like so. I'll find that clip in a minute. It works in a manner like so. As you shoot it—I'm not good with these things—you shoot it. Called an automatic because when you shoot it the recoil makes this go back, the bullet comes out of there (indicating), you see? Another bullet is loaded, and that bullet is loaded from the clip.

Okay. Well, now when you get in the jury room, if you look down inside there, ... that chamber goes down into the clip ... because when the clip is in there, that's how it's loaded ... and that primer residue gets down on the clip in the hand, you see?

Juror Myers said she recalled defense counsel demonstrating during jury argument how the deceased might have loaded that gun and how the residue could have gotten on his hands. Juror Koenning recalled the juror loading the pistol, but he did not recall that he was familiar with guns. He also recalled that defense counsel showed the jury "his theory of how John Willmann got primer residue on his hands." He agreed this was in answer to the medical examiner's testimony that the residue got on the palms of deceased's hands when he held them up before the shotgun. Juror Hopper agreed that one of the jurors load-

ed the pistol and used his fingertips. She also remembered defense counsel demonstrated with the pistol during jury argument and talked about how deceased could have gotten primer residue by putting bullets into the clip and loading the pistol. Juror Dempsey said he recalled the jury argument by defense counsel and his demonstration of the pistol to show how primer residue could have gotten on the dead man's palms.

Significantly, no juror testified that the juror who was familiar with guns told them there was only one way to put the clip into the pistol, and therefore the residue could not have been on the palms of the deceased's hands. The defense counsel reminded the jury they could take the gun into the jury room and study it. The testimony shows they did that.

◼ Appellant contends the juror's demonstration of the pistol constituted "other evidence" as prohibited by the statute. We do not agree. Appellant relies upon several cases. They are all distinguishable.

In *Garza v. State*, 630 S.W.2d 272 (Tex. Crim.App.1981) the other evidence received in the jury room was the reputation of the defendant and his prior criminal record, which were not in evidence during the trial. *Rogers v. State*, 551 S.W.2d 369 (Tex.Crim. App.1977) involved conflicting evidence of identification of the defendant as the robber. The juror told others he had been a robbery victim and, "you never forget a face in a robbery." The jurors in *Alexander v. State*, 610 S.W.2d 750 (Tex.Crim. App.1981) discussed evidence not in the record of the defendant's "bad" reputation. In *Bearden v. State*, 648 S.W.2d 688 (Tex. Crim.App.1983) a juror said he knew from personal experience that the drink glasses at the same clubs that the defendant visited in the DWI case contained "doubles" and not "singles." This was not in the record of the trial. The means used to cause death was the hotly contested issue in *Hunt v. State*, 603 S.W.2d 865 (Tex. Crim.App.1980). Strangulation by ligature was alleged as an element of the offense in that indictment. A juror told others of his

personal military duty knowledge of strangulation by ligature, and how it killed quickly. His statements, challenging expert testimony, were not part of the evidence at trial. In *Hartman v. State*, 507 S.W.2d 557 (Tex.Crim.App.1974) a juror placed before other jurors the fact that the defendant in that rape case was already serving a sentence for rape and had said he would kill again, when such evidence had not been introduced in trial.

In the present case the defense counsel asked jurors to examine the pistol and clip. They would logically discuss the evidence defense counsel had attempted to elicit from the medical examiner: an alternative explanation for the presence of primer residue on the deceased's hands. The medical examiner said that while appellant's explanation was a possibility, in his opinion, it was not a probability. While the juror did state he was familiar with guns, he made no assertion that there was only one proper method of loading the gun, and he did not call attention to use of his fingertips. The two jurors who loaded the pistol were simply doing what the defense counsel had done—loading the gun. We hold this was not "other evidence" as contemplated by the jury misconduct statute. The trial court correctly denied the motion. The point is overruled.

Appellant's second point of error is that certain evidence was improperly admitted over his objection. The evidence complained of concerned the removal of furniture and readying the house where deceased lived for rental. Evidence showed the brothers clashed repeatedly over the administration of the estate of their recently deceased parents. Within one and one-half weeks after the death, appellant cleared out the furniture and prepared the deceased's house to rent. The State sought to prove the motive for the killing was appellant's desire to gain control of all the estate.

Appellant testified that he and his brother, the deceased, had heated arguments concerning the real estate and other financial matters. Appellant claimed the house was initially given to him, but his brother moved into it over appellant's protest. Appellant wanted to rent out the property, but the deceased prevented this by moving in.

Appellant also said on the day of the offense the brothers argued again, fought, and appellant pushed his brother to the floor. He testified he heard the desk drawer containing an automatic pistol open, and thinking his brother was getting the pistol, he got a loaded 16 gauge shotgun and went into his bedroom to wait. He said his brother entered the bedroom some minutes later carrying a pistol, and appellant shot him.

He testified he sold the brother's art studio to the girlfriend of the brother for $500.00 but refused to let her have anything else. In rebuttal the State called the woman as a witness. The testimony concerning the missing furniture and rental of the house was placed before the jury. Appellant objected it was "irrelevant and immaterial." Further, that it was cumulative and not probative. The objections were overruled.

 While the objections at trial may have been vague, *See Maynard v. State*, 685 S.W.2d 60, 64 (Tex.Crim.App.1985), and different than the argument on appeal, the appellate argument of improper introduction of extraneous conduct may go to materiality and relevance. The State argued that the appellant did "what it took" to acquire his parents' estate. Extraneous transactions shown to have been committed by an accused may become admissible upon a showing by the prosecution both that the transaction is relevant to a material issue in the case, and the relevancy value of the evidence outweighs its inflammatory or prejudicial potential. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983). We find the evidence was properly admitted, going to the existence of a motive on the part of appellant to commit the offense for which he was on trial. *See Bush v. State*, 628 S.W.2d 441, 444 (Tex.Crim.App. 1982). The point is overruled.

In his third point of error appellant complains of the admission of rebuttal testimo-

ny by the deceased's girlfriend that appellant refused to give her the deceased's artist-painting shirt. The woman testified that she bought deceased's art studio, art supplies and fixtures, from appellant, but complained she also wanted the artist's shirt. However, appellant refused, saying he and his brother were "about the same size."

The evidence, including the testimony of appellant, established ill-will in the brothers' relationship. Further, testimony revealed appellant believed his mother had favored the deceased. The State sought to show appellant harbored a long-time jealousy of his brother, resented and was angered over the estate's financial problems, and argued repeatedly with his brother. The motive to murder, the State sought to prove, resulted from the jealousy, the volatile relationship, and appellant's desire to obtain control over the entire estate.

■ All the evidence concerning the relationship between the appellant and the deceased was admissible under the provisions of TEX.PENAL CODE ANN. § 19.06 (Vernon 1974). This included subsequent acts of the appellant relevant to proof of the condition of the mind of the accused at the time of the offense. Again, this evidence went to the motive to murder in order to obtain complete control of the estate.

Even if proper objection had been made, we would find the evidence was admissible. However, we note the objections which were made were vague and different from the one on appeal, which was extraneous conduct. The objections before the jury were "improper rebuttal" and "not in the nature of impeachment." Appellant presented nothing for review. *Cravens v. State*, 687 S.W.2d 748, 752 (Tex.Crim.App. 1985). The point of error is overruled.

In his fourth point of error appellant says the prosecutor injected new and harmful facts during jury argument: that the .25 caliber automatic had been wiped clean of fingerprints. In response to appellant's motion in limine regarding the pistol, appellant asked the trial court to rule that while the State would be permitted to

prove there were no fingerprints on the pistol, the State could not elicit testimony or refer to the fact that it must have been wiped clean. At the hearing appellant argued: "We are not saying they can't *argue why something was wiped off*, we're just saying we don't feel like an expert can testify that they were wiped off."

The trial court ruled that, "Witnesses will not be permitted to speculate as to why they couldn't find prints." The evidence shows that the pistol had no fingerprints on it when found. Appellant testified that his brother, the deceased, held the pistol in his hand when he came into the room and that he dropped the gun when he fell after being shot.

The prosecutor, in jury argument stated: "This gun that Officer Wheeler told you he couldn't raise any fingerprints from, but it was unsmeared...." Appellant then objected at the bench, out of the jury's hearing, saying the prosecutor "just picked up [the] gun and is wiping it with a handkerchief in front of the jury ... thereby insinuating to the jury that the gun was wiped clean." He said the officer's testimony had been "those guns hardly ever pick up fingerprints." The court overruled the objection.

Before the jury again, the prosecutor said, "I'm wiping this clean since it's been handled in argument." [The record reflects defense counsel did handle the pistol, loading and unloading the clip during trial and jury argument.] The objection was that the comments were improper "and in violation of the Court's order."

We note the comment itself did not violate the court's ruling on the motion in limine. The objection made before the bench went to the *action* of the prosecutor in wiping the gun. The State continued by arguing that the gun was not only clear of fingerprints but also had no blood or other material on it like that clinging to one of the deceased's hands.

■ Assuming the action is interpreted as jury argument, the standard for jury argument as set out in *Darden v. State*,

629 S.W.2d 46, 52 (Tex.Crim.App.1982) allows: 1) summation of the evidence; 2) reasonable deductions from the evidence; 3) answers to argument of opposing counsel; or, 4) pleas for law enforcement. Under the circumstances of this case a reasonable deduction would be that the pistol had been wiped clean by appellant. This would not constitute improper argument since it was based on the evidence. Another argument by the State as a deduction from the evidence was that the deceased never even had the gun in his hand. A further reasonable deduction to be made in that instance would be that appellant had wiped the gun clean if he had placed the gun at the scene. While the action of the prosecutor was interpreted by defense counsel to mean only one thing, we find the action to be ambiguous, at best, and have no way of knowing the effect on the jury, or even if they observed it. The fourth point is overruled.

In the fifth point appellant seeks to set aside an affirmative finding by the trial court that he used a deadly weapon during the commission of the offense. The indictment charged that appellant caused the death of deceased "by shooting him with a gun." The jury found appellant "guilty of the offense of murder as charged in the indictment." The judgment recites that appellant was found guilty of "murder (gun used)."

■ A "gun" is not a deadly weapon *per se*. *Boyett v. State*, 692 S.W.2d 512, 517 (Tex.Crim.App.1985); TEX.PENAL CODE ANN. § 1.07(a)(11)(A) (Vernon 1974). In both the indictment and the application portion of the court's charge, the instrumentality of death was a gun. Therefore, the jury found that a gun was used. An affirmative finding of the use of a *deadly weapon* was not made by the jury. *See Ex parte McLemore*, 717 S.W.2d 634 (Tex.Crim.App.1986).

In this case the trial court was not authorized to find the "gun" was a deadly weapon for purposes of TEX.CODE CRIM. PROC.ANN. art. 42.12 § 3g(a)(2) (Vernon Supp.1986) since "gun" was alleged as an element of the offense in the indictment, and the jury's verdict found appellant guilty of murder as alleged in the indictment. The point of error is sustained. Since the words in parenthesis, (gun used), might be interpreted to mean "deadly weapon" and operate to bear upon the time served by appellant, we order the words (gun used) to be stricken from the judgment and reform the judgment by deleting those words.

The judgment of the trial court is reformed and affirmed.

CANTU, Justice, concurring in part, dissenting in part.

I refuse to ascribe to the proposition that there is any logical reason to make a distinction between a gun, a handgun or a pistol insofar as two are deadly weapons *per se* and the other is not.

In *Dade v. State*, 622 S.W.2d 580 (Tex. Crim.App.1981) it was recognized that a handgun is a deadly weapon *per se*. (citations omitted). *See also Ex parte McLemore*, 717 S.W.2d 634 (Tex.Crim.App.1986). In *Williams v. State*, 567 S.W.2d 507 (Tex. Crim.App.1978), a pistol was found to be a deadly weapon *per se*. The same was true of a firearm in *Stewart v. State*, 532 S.W.2d 349 (Tex.Crim.App.1976), and a 30–30 calibre rifle in *Bravo v. State*, 627 S.W.2d 152 (Tex.Crim.App.1982) (en banc).

A firearm is a deadly weapon *per se* because the legislature decreed that it be so. *See* TEX.PENAL CODE ANN. § 1.07(a)(11) (Vernon 1974); *Ex parte Campbell*, 716 S.W.2d 523 (Tex.Crim.App. 1986). Deadly weapon is in § 1.07(a)(11) defined as:

(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

A firearm is "an instrument used in the propulsion of shot, shell, or bullets by the

action of gunpowder exploded within it." 2 BOUVIER'S LAW DICTIONARY 1230 (8th ed. 1914). *See also* definitions of firearm in *Ex parte Campbell, supra.*

If a handgun and a pistol are deadly weapons *per se* because they are firearms, then I see no logical reason to exclude a gun from the category of a deadly weapon *per se.*

A gun has been defined as "any portable firearm, as a rifle, musket, carbine, etc. ... a pistol or revolver ...", FUNK & WAGNALLS NEW COLLEGE STANDARD DICTIONARY 526 (1956); "Any portable firearm, as a rifle; any similar device for projecting something", NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 431 (1981); compared to a rifle, cannon, and revolver, THE NEW ROGET'S THESAURUS 42 (rev. ed. 1978) (see arms); "a portable firearm (as a rifle, shotgun, carbine, pistol)", WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1011 (1981).

I would take the same logical approach taken by Presiding Judge Onion and the majority in *Ex parte Campbell, supra,* when considering the status of a handgun as a deadly weapon *per se* and extend it to a "gun." To do otherwise is nonsensical inasmuch as the common meaning of a gun is to be found encompassed under the term "firearm" as are handgun and pistol.

The majority opinion can only be correct if one concedes that a gun is not a deadly weapon *per se,* something I am not prepared to do in the absence of some guidance by the Texas Court of Criminal Appeals.

I believe that the majority goes astray when it relies on *Boyett v. State,* 692 S.W.2d 512 (Tex.Crim.App.1985) (en banc) for the proposition that a gun is not a deadly weapon *per se.* A close reading of *Boyett* reveals that it has totally misconstrued the language in *Chavez v. State,* 657 S.W.2d 146 (Tex.Crim.App.1983) (en banc)[1]

its sole point of reference, when it holds that a gun is not a deadly weapon *per se. Chavez,* in fact, merely holds that "gun" has not been found to be a deadly weapon *per se.* Clearly that is not saying that "gun" is not deadly *per se* but only that the question of status is open for future determination. Unfortunately *Boyett* is not the only case erroneously misconstruing *Chavez. See also Ex parte Grabow,* 705 S.W.2d 150 (Tex.Crim.App.1986) (en banc); *Polk v. State,* 693 S.W.2d 391 (Tex.Crim. App.1985) (en banc); *Wissinger v. State,* 702 S.W.2d 261 (Tex.App.—Houston [1st Dist.] 1985, pet. ref'd) and see cases perpetuating the error by following the *Boyett* conclusion *i.e., Smith v. State,* 721 S.W.2d 844 (Tex.Crim.App.1986); *Easterling v. State,* 710 S.W.2d 569 (Tex.Crim.App.),[2] *cert. denied,* — U.S. ——, 107 S.Ct. 170, 93 L.Ed.2d 108 (1986); *Ex parte Grabow, supra.*

Nevertheless, and in spite of the recent rash of cases being misled by *Boyett* I am unaware of any case where the question of "gun" being addressed directly has resulted in a holding that a "gun" is not a deadly weapon *per se.* I dare say such an opinion will be hard pressed to distinguish "gun" from pistol or handgun to justify different treatment, other than as a firearm.

Under authority of *Ex parte Campbell, supra,* and *Polk v. State, supra,* the jury as trier of fact did in fact make an affirmative finding via its verdict.

In *Polk* it was stated,

Where the jury is the trier of fact, the trial court may not properly enter that they have made an affirmative finding concerning the defendant's use or exhibition of a deadly weapon or firearm during the commission of the offense unless:

1) the deadly weapon has been *specifically* plead *as such* (using the nomenclature 'deadly weapon') in the indictment. (Applies where the verdict reads,

---

**1.** Curiously Judge W.C. Davis authored both the *Chavez* and *Boyett* opinions.

**2.** Whether it has long been established that a gun is not a deadly weapon *per se* depends upon whether perpetuating a mistake suffices to give the mistake precedential value.

'guilty as charged in the indictment.' *See Barecky* [*v. State*, 639 S.W.2d 943 (Tex.Cr.App.1982) ], *supra.*)

2) where not specifically pled in '1)' above as a deadly weapon or firearm, the weapon pled is per se a deadly weapon or a firearm; or

3) a special issue is submitted and answered affirmatively. (emphasis in original)

*Polk, supra* at 396.

In the instant case the indictment did not specifically plead the instrument used using the nomenclature "deadly weapon" nor was a special issue submitted to the jury. Therefore, if the verdict can be construed as an affirmative finding, it must be so because it fits into category "2," that is, the instrument is a deadly weapon *per se* or a firearm.

In my opinion the instant case is no different from *Ex parte Campbell, supra.* A firearm is a deadly weapon and a gun is a firearm.

I would hold that the jury's verdict making reference to the indictment together with the fact that a gun is a deadly weapon *per se* is a sufficient affirmative finding that a deadly weapon was used in the commission of the offense. I would overrule appellant's fifth point of error seeking to set aside the affirmative finding in the judgment. Moreover, I would not characterize the finding as a trial court finding inasmuch as the reference to the expression "gun used" is nothing more than an entry by the court reflecting the finding of the jury as evidenced by their verdict.

I concur with the majority opinion affirming the conviction but dissent to the action of the majority ordering reformation of the judgment.